UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Kim William Rowe,

      Petitioner,

v.

Tammie Joan Vargason,

      Respondent.

**MEMORANDUM OPINION
AND ORDER**
Civil No. 11-1966

_____

      Mary E. Seaworth, Counsel for Petitioner.

      Becky R. Thorson, Shira Shapiro and Seth A. Northrup, Robins, Kaplan,
Miller & Ciresi L.L.P., Counsel for Respondent.

_____

## I.   Introduction

On July 20, 2011, Petitioner, Kim William Rowe, filed a Verified Petition for

Return of Child to Australia.  The Petition has been filed pursuant to the

Convention on the Civil Aspects of International Child Abduction ("Hague

Convention") and the International Child Abduction Remedies Act ("ICARA"),

42 U.S.C. § 11601 et. seq.  Petitioner and Respondent, Tammie Joan Vargason, are

both citizens of Australia, and together they have a son, TJR, who is currently

four years old.  On July 19, 2010, Respondent left Australia with TJR, without

1

Petitioner's consent, and moved to Detroit Lakes, Minnesota with her husband, a

U.S. citizen, and their infant daughter.

Pursuant to ICARA, 42 U.S.C. § 11604 and the Uniform Child Custody

Jurisdiction and Enforcement Act ("UCCJEA"), Minn. Stat. § 518D.101 et. seq.,

the Court issued an Order to Show Cause prohibiting the removal of the minor

child from the State of Minnesota, taking into safekeeping the child's passport

and travel documents, and commanding Respondent to appear with the child to

show cause as to why she has kept the child from his father.  The passports were

turned over on August 4, 2011.

In response to the Petition, Respondent filed a motion to dismiss.  Prior to

ruling on the motion to dismiss, the Court held an evidentiary hearing on the

Petition.  At such hearing, the Court heard testimony from Petitioner,

Respondent, Christine Rowe, Dr. Jeffrey Edleson, Dr. David Mathews and Ashlee

Fairbanks-Vargason.  Based on such testimony, the exhibits admitted at the

hearing, the records and proceedings herein, the Court makes the following

findings.

## II.    Factual Background

The parties met in Australia in 2005, when Respondent was 17 years old

and the Petitioner was 30 years old.  Petitioner testified that they met while he was on vacation at the Gold Coast.  Respondent, on the other hand, testified that they first met online, and that after months of daily phone and internet contact, Petitioner flew from Perth, located on the western coast of Australia, to Dalby, which is close to the east coast of Australia to meet Respondent in person. Thereafter, Petitioner drove Respondent to the Gold Coast, where they stayed for approximately one week.  Petitioner then flew back to Perth, but he continued to stay in contact with Respondent.  Eventually, Petitioner moved to Dalby, to live with Respondent and her mother.

After one to two weeks, Respondent's mother kicked Petitioner out of her home.  Petitioner convinced Respondent to leave with him, and she agreed to do so.  They drove to the Gold Coast in Petitioner's rental car, but as they did not have a place to stay, they slept in the car until it was repossessed for nonpayment.  Respondent testified that during this time, Petitioner became very controlling and took steps to isolate Respondent from family and friends.  It was also during this time that Petitioner became pregnant with TJR.  After learning she was pregnant, Respondent was able to get bus tickets back to Dalby from a teen center for herself and Petitioner.

Petitioner testified that his relationship with Respondent, in the beginning, was very good. He stated that he was able to obtain employment and find a place for them to live. TJR was born in November 2006. Initially, Respondent stayed at home with the baby, while Petitioner worked. In early 2007, they moved to Brisbane to allow Petitioner to find work different work. Petitioner did find a job, but he testified he was fired after a couple of weeks because Respondent was needy and would constantly call him at work and demand that he come home. Respondent, on the other, testified that Petitioner was fired from his job because he repeatedly failed to go to work.

When TJR was approximately three or four months old, Respondent began to engage in prostitution. Petitioner testified that it was Respondent's idea to become a prostitute, and that she placed an ad in the paper, announcing her services. Petitioner claims that he did not want Respondent to engage in this activity, but that Respondent insisted. To ensure her safety, Petitioner testified that he went to "appointments" with Respondent, and waited for Respondent in the car with TJR.

Respondent testified that Petitioner forced her into prostitution, that he placed the ads, collected the money and made all appointments. Respondent

4

further testified that after just a few weeks, she arranged to move back into her mother's home so she would not have to prostitute herself anymore.

Back in Dalby, the parties were able to get their own apartment, next to Respondent's mother.  A police report from October 2007 provides that there was a domestic disturbance involving the parties, and that Respondent told the police that Petitioner was domineering and controlling, and that he previously forced her into prostitution.  Respondent also told the police that Petitioner would take Respondent's money, and would control what money she would receive.

By May 2008, their relationship had completely deteriorated.  On May 13, 2008, Petitioner came home to find that Respondent was talking with another man, her now husband, over the internet.  An argument ensued, resulting in Petitioner being stabbed with a knife by Respondent.  Petitioner claims that they were arguing, and that Petitioner blocked the door to prevent Respondent from leaving with TJR.  Petitioner claims that Respondent then retrieved the kitchen knife to get Petitioner away from the door, and that during a struggle, Petitioner was stabbed.  Respondent claims that Petitioner got the knife from the kitchen and was threatening to kill her, but that she was able to get the knife away from Petitioner, and that Petitioner was stabbed during a struggle.  There is no dispute

to the fact that Respondent stabbed Petitioner, and that Petitioner went to the

hospital, and the police were called.  The police requested that an Intervention

Order be entered, to prohibit the parties from having contact with each other.

At that time, Petitioner agreed that Respondent would have custody of

TJR, and that Respondent and TJR would live with Respondent's mother, as long

as her mother did not drink any alcohol, as there were concerns the mother was

an alcoholic.  Because Respondent's mother began to drink, Respondent and TJR

moved to Darwin, Australia, to live with Respondent's father.  She did not notify

Petitioner of this move, however.

Petitioner was able to locate Respondent, and the two began talking with

each other, despite the Intervention Order that prohibited such contact.

Respondent eventually moved to Morewell, Australia, after her current husband,

Andrew Vargason moved to Australia to be with Respondent.  During this time,

Petitioner did have not any contact with TJR.  Approximately one year later,

Petitioner moved back to Perth, because he had lost his job and was unable to

find another.  Petitioner testified that he was also depressed, as he learned that

Andrew Vargason, Respondent's husband, wanted to be TJR's father, and that he

did not want Petitioner to have any contact with TJR.  Petitioner testified that

during this time period, he tried to commit suicide.

Petitioner testified that he tried to get the Intervention Order modified, but was unsuccessful.  Petitioner and Respondent continued to communicate through Facebook, and Petitioner testified that he believed the parties would be able to work out an arrangement during Christmas 2009, which would allow Petitioner to visit with TJR.  In December 2009, however, Petitioner received a notice of a hearing on a new Intervention Order from the State of Victoria.

Respondent testified that she received a call from Petitioner's mother, Christine Rowe, on December 19, 2009, during which Respondent was told that Petitioner was doing drugs and was planning on kidnaping TJR.  In the application for an Intervention Order, Respondent made the following allegations: 1) that Petitioner's mother called and told her that Petitioner and his new girlfriend were planning on kidnaping TJR and that Petitioner was doing drugs; 2) "[Petitioner] found out I was talking to someone (my new husband) on the internet he yelled and choked me then pulled out a kitchen knife threatening to kill me while he was yelling at me I struggled to get the knife off him, he then lunged at me, it cut him (a small cut) I threw the knife, picked up my baby and ran to my mother's house down the street where I had the police called"; 3)

7

Petitioner had raped her three times in 2006-07 in the State of Queensland; 4)

Petitioner has been with girls under the age of 15 and that he is a pedophile; 5)

Petitioner had forcibly shaken their son; 6) Petitioner was caught masturbating,

while their son lay next to him on the bed.  (Respondent Ex. 100.)

The hearing on Respondent's application was held on January 8, 2010.

Petitioner did not attend the hearing, although he did receive notice.  An

Intervention Order was entered on that date, prohibiting all contact between

Petitioner and Respondent and TJR through January 7, 2012.  (Respondent Ex.

101.)  The Order notes that Petitioner did not agree to the Order being made.

After the January 2010 Intervention Order was entered, Petitioner filed a

passport alert with the Australian passport authority.  Shortly thereafter,

Respondent filed an application for a passport for TJR.  Around this time,

Respondent had given birth to a daughter, and in her passport application

indicated that she and her husband wanted to travel to Minnesota to visit her

husband's grandmother.   Respondent further noted in the application that she

planned on being in the United States for three months.  Notwithstanding the

alert filed by Petitioner, Respondent was able to obtain a passport for TJR

without Petitioner's consent, under the "special circumstances" exception due to

the allegations of abuse and the Intervention Order.

Respondent, with her husband and both children, left Australia on July 19, 2010. After learning that Respondent and TJR were in the United States, and that Respondent did not plan to return to Australia, Petitioner instituted proceedings for the return of TJR with the Central Authority in Australia, which lead to this Petition being filed electronically on July 19, 2011 and entered into the court docketing system on July 20, 2011.

## III.  Standard

Pursuant to ICARA, the Court must order the return of the child if the Petitioner proves by a preponderance of the evidence that his son was a habitual resident of Australia, and if his removal was wrongful. Courts should keep in mind that the primary purpose of the Convention: "to restore the *status quo ante* and to deter parents from crossing international boundaries in search of a more sympathetic court." Silverman v. Silverman, 338 F.3d 886, 899 (8th Cir. 2003) (en banc). In this case, the record is clear that at the time TJR left Australia, he was a habitual resident of Australia. The parties dispute, however, whether the removal was wrongful and it is this issue that is the basis of Respondent's motion to dismiss.

9

## A.    Claim Under Article 3 of the Hague Convention

Under the Hague Convention, the removal or retention of a child will be

considered wrongful if

> – a) it is in breach of rights of custody attributed to a person, an institution
> or any other body, either jointly or alone, under the law of the State in
> which the child was habitually resident immediately before the removal or
> retention; and b) at the time of removal or retention those rights were
> actually exercised, either jointly or alone, or would have been so exercised
> but for the removal or retention.

Article 3 of the Hague Convention.  Here, Petitioner asserts that at the time of

removal, he had rights of custody to TJR and was exercising or attempting to

exercise those rights, citing to the Australia Family Law Act 1975

(Commonwealth) §§ 60CA, 60CC and the Family Court Act of 1997 (State of

Western Australia) §§ 66A, 70A and 66C.  (Ex. B to Petition).  Petitioner has also

submitted an affidavit of applicable law in accordance with the Hague

Convention, executed by a lawyer of the Australian Capital Territory Supreme

Court, Jennifer Louise Furze.  The affiant states that section 69 of the Family

Court Act 1997 (WA) and 111B(4)(a) of the Family Law Act of 1975 is that "both

parents of a child retain joint parental responsibility under Australian law and

'rights of custody' for purposes of the Convention for their child until their child

reaches the age of 18 years, unless parental responsibility has expressly been taken away by an order of the court."  (Petitioner Ex. 1 (Furze Aff. ¶ 8) [Doc. No. 26].)

In her motion to dismiss this Petition, Respondent asserts that Petitioner has failed to state a claim for relief under the Hague Convention.  She claims that Petitioner has not, nor can he, establish that he had any custody rights that have been breached or that he was exercising any custody rights at the time of TJR's removal.  "The Convention defines 'rights of custody' to 'include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence.'" <u>Abbott v. Abbott</u>, 130 S. Ct. 1983, 1989 (2010) (quoting Hague Convention art. 5 (a)).

Respondent first asserts that Petitioner has failed to cite to any Australian law that supports his claims to custody of TJR.  Instead, Petitioner cites to a compilation of Australian law that defines the process and procedures related to custody determinations, but they do not define or identify any rights of custody that Petitioner now alleges.

Even if Petitioner had identified a right to custody under Australian law, Respondent argues the Intervention Order vitiated any parental rights of the

11

Petitioner.  Respondent argues that an Intervention Order will issue only if the

judge is satisfied that the subject of the Order has committed family violence

against the affected family member and is likely to continue to do so in the

future.  (Respondent Ex. 1 [Doc. No. 16-1], Austl. Family Violence Protection Act

2008, § 74.)  Given the scope of the Intervention Order issued, Respondent argues

such Order effectively repudiated any custody rights Petitioner may have had.

Respondent further asserts that in implementing the Hague Convention,

Australian law contemplates that rights of custody under the Convention are

subject to revocation by court order.  (Respondent Ex. 2 [Doc. No. 16-1], Aust.

Family Law Act 111B(4) (1975)); see also Sealed Appellant v. Sealed Appellee, 394

F.3d 338, 343-44 (5th Cir. 2004).

Next, Respondent argues that by issuing TJR a passport over the

Petitioner's objections, the Australian government made a *de facto* determination

that Petitioner had no parental responsibility over TJR.  Under Australian law,

the government cannot issue a passport unless each person with parental

responsibility consents to the child traveling internationally or an order of a court

of the Commonwealth, a State or Territory, permits the child to travel

internationally.  (Respondent Ex. 3 [Doc. No. 16-1], Aust. Passports Act, 2005, §

12

11(1)(a)-(b); Austl. Gov't, Dep't of Foreign Affairs & Trade, "Children and

Parental Consent," available at https://www.passports.gov.

Au/Web/newppt/consent.aspx.)  There are four exceptions to this rule: 1) special

circumstances; 2) endangerment of the child's welfare; 3) family crisis and an

inability to contact the non-consenting parent; and 4) so that the child can return

to Australia.  (Id. § 11(1)(c).)

In this case, the Australian passport authority issued TJR a passport under

the special circumstances exception. Respondent argues that by issuing the

passport to TJR, the Australian passport authority concluded that Petitioner did

not have parental responsibility sufficient to require his consent or parental rights

to prevent TJR from being taken from Australia.

The Court has carefully reviewed the Intervention Order dated January 8,

2010, and finds that the Order in no way addressed parental responsibility or

rights of custody.  See Nicolson v. Pappalardo, 605 F.3d 100 (1st Cir. 2010)

(finding that a protection order does not terminate parental rights or rights of

custody).  The Intervention Order was temporary in nature, and it responded

only to specific threats alleged by the Respondent, that were unchallenged by

Petitioner at the time of issuance.  Accordingly, the Court finds that the

Intervention Order did not terminate Petitioner's rights of custody to TJR.

The Court further declines to find that in issuing a passport to TJR, the Australian passport authority made a *de facto* determination as to Petitioner's parental rights for purposes of a claim under the Hague Convention.  Again, there is nothing in the record to support Respondent's assertions that the passport authority made any *de facto* custody determinations for purposes of a claim under the Hague Convention.

Respondent further argues that even if Petitioner did have rights of custody under the Convention that were breached, Petitioner did not plead that he was exercising those rights at the time Respondent removed him from Australia.  Under the Hague Convention, the Petitioner must keep or seek to keep any sort of regular contact with the child to exercise custody rights.  Friedrich v. Friedrich, 78 F.3d 1060, 1065 (6th Cir. 1996).  Respondent argues that Petitioner has not plead that he had or sought regular contact with TJR.

In determining whether a petitioner is exercising rights of custody for purposes of a claim under the Hague Convent, other courts have interpreted "exercise" very broadly.  Sealed Appellant, 394 F.3d at 344.

14

In <u>Freidrich</u>, the Sixth Circuit held

> if a person has valid custody rights to a child under the law of the country of the child's habitual residence, that person cannot fail to "exercise" those custody rights under the Hague Convention short of acts that constitute clear and unequivocal abandonment of the child.  Once it determines that the parent exercised custody rights in any manner, the court should stop-completely avoiding the question whether the parent exercised the custody rights well or badly.  These matters go to the merits of the custody dispute and are, therefore, beyond the subject matter jurisdiction of the federal courts.

78 F.3d at 1066.

Respondent admits that Petitioner provided support for TJR on at least one occasion (Petitioner testified that he provided regular support payments), and has made sporadic attempts to contact Respondent over the last two years.  It is also undisputed that Petitioner filed a passport alert, to prevent the Respondent from obtaining a passport for TJR without his consent.  While these attempts do not establish regular contact with TJR, they demonstrate that Petitioner did not clearly and unequivocally abandon his custody rights to TJR.

The Court thus finds that for purposes of Petitioner's claim under the Hague Convention, Petitioner had custody rights that he was attempting to exercise at the time Respondent removed TJR from Australia, and that such removal was in breach of Petitioner's rights.  Accordingly, the Court finds that

Petitioner has established a prima facie claim for return of TJR to Australia under Article 3 of the Hague Convention.

**B.     Article 13(b) Exception**

Although Petitioner has met his initial burden, Respondent has the opportunity to challenge TJR's return to Australia by showing through clear and convincing evidence that one of the exceptions set forth in Article 13(b) or 20 of the Convention applies.  42 U.S.C. § 11603 (e)(2).  Article 13(b) addresses the situation where "there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation."  Article 20 provides that return of the child is not warranted "if this would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms."  In her Verified Counter-Petition, Respondent requests that the Court deny the Petition on the basis that TJR is in grave risk of physical or psychological harm, or will otherwise face an intolerable situation, if returned to Australia.

The Eighth Circuit has recognized two types of grave risk under Article 13(b): sending a child to a 'zone of war, famine, or disease,' or in cases of serious

16

abuse or neglect." Silverman, 338 F.3d at 900 (citing Friedrich v. Friedrich, 78

F.3d 1060, 1069 (6th Cir. 1996) (finding that a grave risk exists "in cases of serious

abuse or neglect, or extraordinary emotional dependence, when the court in the

country of habitual residence for whatever reason may be incapable or unwilling

to give the child adequate protection."))   In addition, the Eighth Circuit has held

that "exceptions to the Convention are to be narrowly construed." Nunez-

Escudero v. Tice-Menley, 58 F.3d 374, 376 (8th Cir. 1995).  By construing the

exceptions narrowly, the court noted that general evidence concerning abuse of

the mother is not sufficient to establish the Article 13(b) exception that return will

expose the child to a grave risk of harm. Id. (citing Rydder v. Rydder, 49 F.3d 369,

372 (8th Cir. 1995)).

The Article 13(b) inquiry must focus on "whether the child will face

immediate and substantial risk of an intolerable situation if [the child] is returned

to [Australia] pending final determination of [the] parents' custody dispute." Id.

The court further cautioned that district courts must not consider who is the

better parent, whether the respondent has good reason to leave the family home,

or whether the respondent will suffer if the child is returned.  Id.  The court can,

however, "consider the environment in which the child will reside upon

17

returning to the home country." Id. To ensure that the child is adequately

protected, the court's inquiry must also "encompass some evaluation of the

people and circumstances awaiting that child in the country of [the child's]

habitual residence." Id. at 378.

Respondent argues that there is a grave risk that TJR's return to Australia

would expose him to physical or psychological harm or otherwise place him in

an intolerable situation. First, Respondent claims that Petitioner physically and

psychologically abused her when they were together. Respondent testified that

early in their relationship, Petitioner raped her on three occasions; once when she

was three months pregnant with TJR. Respondent further alleges that Petitioner

was very controlling; that he would isolate her from family and friends, and that

he would control the money she received from the government, and that he

forced her into prostitution. Respondent also testified that Petitioner abused her

emotionally by telling her she was fat or that she looked too old. As evidenced in

the application for the January 2010 Intervention Order, Respondent also claimed

that Petitioner choked her and threatened to kill her with a knife. Respondent

further alleges that on three occasions, she witnessed Petitioner shake TJR.

Respondent further testified that Petitioner had inappropriate contact with

minor girls on numerous occasions, and that she believed Petitioner sought out

11 year old prostitutes when he told Respondent he was going out to get food for

TJR.

In support of her claim that TJR will face a grave risk of harm if returned to

Australia, Respondent presented testimony from Dr. Jeffrey Edleson.  Dr.

Edleson received his Bachelor's degree from the University of California,

Berkeley, and received a Master's degree and his Ph.D in Social Work from the

University of Wisconsin, Madison.  He is currently involved in research

involving the impact and assessment of violence exposure on children,

international parental abduction in cases involving domestic abuse and

evaluating interventions and policies on family violence.  (Respondent Ex. 301

(Edleson Curriculum Vitae).)   Currently, he is a professor at the University of

Minnesota, School of Social Work and is the Director of Research and the Director

of the Minnesota Center Against Violence and Abuse.  Dr. Edleson testified that

his most recent research project involve a study funded by the National Institute

of Justice studying Hague Convention cases that involved allegations of domestic

abuse.  Dr. Edleson prepared an expert report in this matter.  (Respondent Ex.

300.)  In forming the expert opinions submitted herewith, Dr. Edleson reviewed

the Petition and accompanying exhibits and affidavit; Respondent's Affidavit

and accompanying exhibits; the Intervention Order and Application; the May

2008 Queensland Police Report; the expert report prepared by Dr. David

Matthews and Erika Arnold-McEwan.  Dr. Edleson also interviewed Respondent

and TJR on August 25, 2011.

Based on his experience, his review of the above materials and his

interview with Respondent and TJR, Dr. Edleson opined that Respondent's

testimony that Petitioner attempted to strangle her is noteworthy, as significant

research shows that such acts are a strong predictor for future, more violent

behavior, including homicide.  He further opined that TJR's exposure to domestic

violence can result in short-term and long-term psychological harm.  It is also his

opinion that evidence of domestic abuse, which includes controlling behavior,

against Respondent provides strong evidence that TJR will eventually experience

child abuse if returned to Petitioner's custody, and that there is a heightened risk

of physical and psychological harm to Respondent if she is required to return to

Australia, which will place TJR at grave risk of physical or psychological harm.

Finally, Dr. Edleson opined that forcing the separation of TJR from his younger

sister would have grave psychological consequences for TJR's development of

positive attachments and would upset TJR's well-established connection with his sister.  (Respondent Ex. 300 at 16-17.)

Respondent also offered an expert opinion from Dr. David Matthews.  Dr. Matthews received a Bachelor's degree in Social Work from Bethel University, a Master's degree in Counseling Psychology from St. Mary's University and a Ph.D. in Psychology from the University of St. Thomas.  Dr. Matthews is the CEO of One T - Counseling, Consultation, Training, Publishing & Production.  One T provides services relative to certain contracts and projects, such as Prevention of Sexual Violence in the Latino Communities of Minnesota and Independent School District 287 to provide counseling for Latino, male students concerning relationships, school success and future goals.  (Respondent Ex. 200 (Matthews Curriculum Vitae).)  He has also served on the Domestic Abuse Project, and as a Professor at Metropolitan State University teaching adolescent psychology.  (Id.)

Dr. Matthews provided an expert opinion in this case on effects of trauma that TJR has been exposed to, and his emotional well-being.  In forming his opinion, he testified that he reviewed police records from Australia, the Intervention Orders, Respondent's Affidavit and accompanying exhibits, the Petition and accompanying exhibits.  He also interviewed Respondent and TJR.

(Respondent Ex. 203.)  Dr. Matthews testified that TJR has a strong bond with his

mother and his younger sister.  He further testified that TJR should not be

returned to Australia if doing so would separate him from his mother and sister.

Dr. Matthews further opined that returning TJR to the custody of his father is the

"most potentially risky to the emotional well-being and physical safety of TJR."

(Respondent Ex. 201 (Matthews Report at 11).)  Dr. Matthews also noted that TJR

has not had any in-person contact with Petitioner for almost 3.5 years, and that it

is uncertain whether the Petitioner could meet TJR's emotional needs.  (Id.)

In response to questions from the Court, both Dr. Edleson and Dr.

Matthews conceded that they did not have complete information before them

concerning the abuse inflicted by Respondent's current husband on both

Respondent and TJR.  Respondent did not dispute that she suffered serious abuse

at the hands of her husband, and evidence has been submitted showing that she

has a protection order against him.  Respondent testified to the fact that her

husband has physically abused her, and that for a time, she and TJR could no

longer live in the home she shared with her husband and her in-laws.  Because

neither expert had complete information before them concerning the abuse by

Respondent's husband, Respondent's new relationship, and TJR's current living

arrangements, the Court finds their expert opinions unreliable.

In addition, Respondent's sister-in-law, Ashlee Fairbanks-Vargason, testified that she witnessed Respondent's husband's abuse towards Respondent and her children. She said she witnessed both TJR and his younger sister being injured by Andrew Vargason and that on occasion, Respondent would vent her frustration on TJR. One evening, Andrew Vargason had hit TJR with a belt, and later in the evening, Ms. Fairbanks-Vargason observed bloody welts on TJR's buttocks, and such injuries prevented TJR from sitting down. She testified that on two occasions, she filed reports to child protection services.

Ms. Fairbanks-Vargason also recounted conversations she had with Respondent concerning Respondent's relationship with Petitioner. Respondent told her that the parties argued a lot, and were not good together, but that Respondent was not scared of Petitioner however, she is afraid of her husband, Andrew. Ms. Fairbanks-Vargason also testified that Respondent had told her that she lied about some documents in order to get a passport for TJR, and that she indicated that the allegations of prostitution was one of the false documents, as was the contention that Andrew's grandmother was dying.

Ms. Fairbanks-Vargason testified that Respondent had, before this Petition

was filed, told her that she was overcome by the demands of being a mother, and considered trying to work out an agreement with Petitioner to allow them to share custody of TJR. Other days, Respondent talked about sending TJR to Australia full-time. She was also aware that the parties spoke frequently on the telephone.

Ms. Fairbanks-Vargason also testified that Respondent has been involved with another man, Jonathan Jackson, since March or April, 2011. Ms. Fairbanks-Vargason testified that in May 2011, Andrew's mother asked both Respondent and her son to leave her home. Respondent and TJR left the Vargason home, without her young daughter, and went to Jackson's home on a reservation near Detroit Lakes. Respondent had called her and asked her to pick up TJR, because she did not believe TJR was safe there, and that child protection had been there. TJR was retrieved from the Jackson home, but Respondent remained there with Mr. Jackson, instead of leaving with TJR. Respondent also told her that Mr. Jackson is very controlling and that he has pushed her and has gotten physical during arguments.

In determining whether the Article 13(b) exception applies, the Court must also take into consideration "the people and circumstances awaiting that child in

24

the country of [the child's] habitual residence." <u>Nunez-Escudero</u> 58 F.3d at 378.

Petitioner informed the Court that he currently lives in Perth, Australia, in a

home with his fiancee and their child, and that TJR will have his own room in

this house. The evidence shows, however, that TJR has never visited Perth, and

has not met any of Petitioner's family or his fiancee.

Not surprisingly, the parties dispute the history of their relationship, and

the level of abuse that occurred between them. The Court notes, however, that

Respondent told her sister-in-law that she is not scared of Petitioner, and that she

considered sending TJR to Australia during summers, or during the school year,

or even full-time. The fact that Respondent did not fear Petitioner is further

supported by the fact that, despite Intervention Orders prohibiting contact, the

parties frequently contacted each other, and Respondent never reported such

contact to the police.

Although there is evidence that while they were together, the parties had a

contentious relationship, and that Petitioner physically and emotionally abused

Respondent, the Article 13(b) exception applies only where the evidence is clear

and convincing that the child is subject to a grave risk of physical or

psychological harm or would otherwise be placed in an intolerable situation, if

returned to Australia.  On the record currently before the Court, the evidence does not meet this threshold.

### C.    Article 12 Exception

Article 12 of the Hague Convention provides that where the petition is filed more than one year after the alleged wrongful removal of the child, return is not warranted if it is demonstrated, by a preponderance of the evidence, that the child is now settled in his new environment.  In determining whether the child is well-settled, courts have considered the following factors: the age of the child; the stability of the child's residence in the new environment, whether the child attends school or day care consistently; whether the child attends church; the stability of the mother's employment; and whether the child has friends and relatives in the area.  In re Application of Lozano, No. 10-CV-8485, 2011 WL 3667444 at *28 (S.D.N.Y. Aug. 22, 2011) (citations omitted).

In this case, the Respondent left Australia on July 19, 2010.  Counsel for Petitioner submitted the Petition, Exhibits and IFP Application to the Clerks Office on the evening of July 19, 2011, but the case was not opened until July 20, 2011, pursuant to the Electronic Case Filing Procedures for the District Court, Section II (A)(2)(d).

Assuming, without deciding, that the action was filed more than a year after the wrongful removal and the well-settled exception applies, the Court finds that at this time, Respondent failed to establish that TJR is well-settled in Minnesota.  TJR is almost five years old, and he left Australia at age three. Respondent admitted that her husband was physically abusive towards her, and there was testimony that her husband physically abused TJR as well.  Further, Respondent is now separated from her husband, but is involved with another man, who, as told to Respondent's sister-in-law, is controlling and physical during arguments.

Respondent testified that she has since moved into a safe, undisclosed location, has separated from her husband, and has enrolled TJR in school and is trying to obtain employment.  This evidence, however, is not enough to show that at this time, TJR is well-settled, given the uncertainties that exist due to Respondent's pending divorce, potential custody issues concerning Respondent's young daughter, and Respondent's unemployed status.  In addition, because Dr. Matthews was not provided sufficient information concerning Respondent's current living conditions, the Court finds his opinion as to whether TJR is well settled is not reliable.

### D.    Conclusions

As noted above, the primary purpose of the Convention is to "restore the status quo ante and to deter parents from crossing international boundaries in search of a more sympathetic court."   Silverman, 338 F.3d at 899.  With this in mind, the Court finds that Respondent did not meet her burden of demonstrating through clear and convincing evidence that there is a grave risk that TJR's return would expose him to physical or psychological harm or otherwise place him in an intolerable situation.  The Court further finds that Respondent did not meet her burden of establishing by a preponderance of the evidence that TJR is well-settled in Minnesota.  Generally, such findings would require the Court to grant the Petition.  However, in this case, the Court has significant concerns about TJR's well-being if returned to Australia.  Despite the fact that the parties have been apart since May 2008, and Intervention Orders have been entered, neither party commenced family court proceedings in Australia to make the appropriate custody determinations concerning TJR.  This Court believes that such proceedings must be commenced in Australia, prior to TJR's return, to ensure that the Australian court system will be able to assert jurisdiction over the parties and TJR, and to enter the appropriate orders providing for a swift resolution of

custody issues and to see to TJR's well-being.

The Court will thus grant the Petition, contingent upon Petitioner providing proof to this Court, within thirty days of the date of this Order, that he has commenced child custody proceedings in Australia.

### E.      Attorney's Fees

Finally, Petitioner requests an award of attorney's fees and costs pursuant 42 U.S.C. § 11607(3), which provides:

> Any court ordering the return of a child pursuant to an action brought under section 11603 of this title shall order the respondent to pay necessary expenses incurred by or on behalf of the petitioner, including court costs, legal fees, foster home or other care during the course of proceedings in the action, and transportation costs related to the return of the child, unless the respondent establishes that such order would be clearly inappropriate.

Respondent requests that the Court deny Petitioner's request for attorney's fees and costs on the basis that she is not yet able to obtain employment, given her immigration status.  Further, Petitioner received legal assistance and costs of travel through legal aid.  Based on the above, the Court finds that an award of attorney's fees and costs is not appropriate in this case.

**IT IS HEREBY ORDERED**: that the

1.      The Court will **GRANT** the Petition [Doc. No. 1] as follows:

contingent upon Petitioner providing documentation to this Court, within thirty days of the date of this Order, demonstrating that he has commenced child custody proceedings in Australia.

2.     In the event Petitioner provides satisfactory documentation that custody proceedings have commenced in Australia, the Court shall issue an Order directing that TJR be returned to Australia.   The parties are encouraged to make mutually agreeable arrangements for such return, and notify the Court of such arrangements.

3.     In the event that Petitioner does not provide proof that he has commenced child custody proceedings in Australia, the parties shall appear before the Court for further proceedings.

4.     Petitioner's request for attorney's fees and costs is DENIED.

Date:   September 28, 2011

s/ Michael J. Davis
Michael J. Davis
Chief Judge
United States District Court